UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
GRADY STARKS,

                Plaintiff

     v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.
--------------------------------------------------------X

**NOT FOR PUBLICATION**

<u>MEMORANDUM & ORDER</u>
04-CV-2632

GARAUFIS, United States District Judge.

       Grady Starks ("Plaintiff" or "Starks") brings this action pursuant to Section 405(g) of the

Social Security Act. 42. U.S.C. §§ 405(g). The Plaintiff challenges and seeks review of the

determination of Administrative Law Judge Robert D. Gill ("the ALJ"), denying his application

for Social Security Disability Insurance ("SSD") benefits. The Plaintiff claims that the ALJ

committed legal error by failing to comply with regulatory mandates and by misapplying the law.

       Now before the court are the parties' cross-motions for judgment on the pleadings. For

the reasons set forth below, the decision of the Commissioner is reversed and remanded for

further proceedings consistent with this opinion.

**I.     Background**

      *A.    Procedural History*

       The Plaintiff filed an application for SSD benefits on May 21, 2001, alleging disability as

of November 30, 1998. (Transcript of Record ("Tr.") at 46-48.) He claimed that due to a

combination of hypertension, depression, anxiety, and hearing problems, he was eligible for SSD

benefits. (<u>Id.</u> at 62.) The Social Security Administration denied his application at the initial level

1

on July 25, 2001.  (Id. at 23.)

On August 10, 2001, the Plaintiff requested a hearing before an ALJ.  (Id. at 27.)  On March 19, 2003, the Plaintiff, represented by counsel, appeared and testified before the ALJ.  (Id. at 223-55.)  A vocational expert also testified at the hearing.  (Id. at 249-54.)  After considering the Plaintiff's claim, the ALJ issued a decision finding that the Plaintiff was not eligible for disability benefits because he had the residual functional capacity to perform his past work as a case technician.  (Id. at 8-20.)  This decision became final on April 22, 2004, when the Appeals Council denied the Plaintiff's request for review of the ALJ's decision.  (Id. at 4-6.)

The Plaintiff then timely filed the instant action seeking review of the Commissioner's decision.

B.    *The Plaintiff's Personal and Employment History*

The Plaintiff was born on March 9, 1940.  (Id. at 46, 229.)  He completed high school and earned a four-year college degree.  (Id. at 68, 230.)  At the time of the hearing, the Plaintiff reported that he lived alone on the eighth floor of an apartment building.  (Id. at 229.)  He also reported that he had a driver's license but did not own a car.  (Id. at 230.)

The Plaintiff was last employed by the city's child welfare agency.  (Id. at 231, 233.)  He was employed as a case worker in the agency's task program from approximately March 1994 until he was terminated in July 1997.  (Id. at 233.)  Following his termination, the Plaintiff returned to work and was transferred pursuant to a stipulation agreement, and he continued to be employed by the agency until October 1997.  (Id. at 232.)

As a case manager, the Plaintiff was required to travel to people's homes, interview individuals and their families, develop a service plan, and maintain case records.  (Id. at 234.)

Generally, his role was to complete short term case management, and then transfer cases over to someone for long-term management. (Id. at 237.) The Plaintiff reported that he spent approximately three hours a day walking, one hour standing, three hours sitting, and two hours typing or handling small objects. This job did not require any significant amount of lifting or carrying. (Id. at 63.) According to the Plaintiff, he was terminated from this position for insubordination and failure to follow agency procedures when he did not refer a case for follow-up as he was required to do. (Id. at 237.)

Following his termination from his case manager position, the Plaintiff was allowed to return to work. At this time, he was transferred to a different job where he had to work at a computer terminal in a small, closed-in space. He reported that the constant noise from the computer terminal caused him problems. (Id. at 69.) After working at this new position for several days, the Plaintiff applied for a leave of absence. (Id. at 239.) He claimed that he could not function in the new position because he had trouble concentrating, hearing people, focusing on tasks, and being confined to a set space for a long period of time. (Id. at 241.)

C.      The Plaintiff's Medical History

1.      Physical Impairments: Hypertension and Hearing Loss

i.      Treating Physician Examinations

Hypertension.  The Plaintiff's chief treating source since his alleged onset date of disability has been the Veterans Administration ("VA"). The records from the VA indicate a history of hypertension based on blood pressure readings of 168/120 (id. at 111), 162/105 (id. at

105), and 140/100 (id. at 97).[1]  At the time of the Plaintiff's hearing before the ALJ, he testified

that he had been diagnosed with hypertension since the mid-1980's, but he had not taken any

medication for hypertension since May 2002.  (Id. at 244.)

Treatment notes from the VA on September 26, 2001, signed by Peggy Yih, M.D., report

that Starks had a history of hypertension and took medications for a while, "but then he stopped

b/c it was okay." (Id. at 166.)  Although the Plaintiff was described as "asymptomatic" for

hypertension at the time of this visit, he was prescribed Atenol, a blood pressure medication, and

he was informed of the importance of his compliance with the prescribed medication.  (Id. at

167.)  Treatment notes completed at the time of a follow-up evaluation on September 27, 2001

report that Starks' blood pressure in his right arm was 180/110 and in his left arm was 190/100.

The Plaintiff was instructed to double his dosage of prescribed blood pressure medication.  (Id. at

171.)

Treatment notes from the Plaintiffs' subsequent visits to the VA indicate that he had not

been compliant in taking his blood pressure medicine.  For example, when the Plaintiff visited

the VA on October 18, 2001, his blood pressure reading was 160/120 in his right arm and was

170/110 in his left arm.  (Id. at 175.)  At this time, the Plaintiff received instructions about the

importance of taking his medications as well as following a strict low salt and low fat diet and

---

[1]Two descriptors, systolic and diastolic, comprise a blood pressure reading.  The systolic pressure (the first number) measures the force that blood exerts on the artery walls as the heart contracts to pump blood.  The diastolic pressure (the second number) is the measurement of the force as the heart relaxes to allow blood to flow into the heart.  Optimal blood pressure is 120/80 (systolic/diastolic).  Reuters, High Blood Pressure, (2002), available at http://www.reutershealth.com/wellconnected/doc14.html.

exercise regimen.  (Id.)  Treatment notes from the Plaintiff's visit to the VA on December 28,

2001 report that the Plaintiff's blood pressure was 190/120.  (Id. at 183.)  Starks had not been

following his diet and was occasionally noncompliant with his prescribed medication.  (Id. at

185.)  At this time, he was instructed to continue taking Atenol.  He was also prescribed

Lisinopril, another anti-hypertensive medication.  (Id. at 186, 188.)  When the Plaintiff was

evaluated at the VA on March 4, 2002, treatment notes indicate, the Plaintiff had not been taking

his blood pressure medications, Atenol and Lisinopril, for about one month.  His blood pressure

was 200/120.  (Id. at 188.)  At a follow-up appointment on March 21, 2001, the Plaintiff stated

that he had been compliant with his medications.  His blood pressure was recorded as 160/111 in

his right arm and 200/100 in his left arm.  (Id. at 190.)

Treatment notes included in the record also reflect Plaintiff's complaints of headache and

dizziness.  (Id. at 105, 179, 185.)

*Hearing Loss*.  On November 15, 2001, the Plaintiff visited the VA's Audiology Services

for a "Hearing Aid Evaluation."  (Id. at 176.)  Treatment notes from this visit report that the

Plaintiff's hearing was tested, and scores indicated a moderate hearing handicap.  (Id.)  Binaural

Phonak custom canal hearing aids with directional microphones were ordered, and the Plaintiff

was fitted with these hearing aids on December 17, 2001.  (Id.)  Notes from a follow-up

Audiology appointment indicate that the Plaintiff had difficulty with his hearing aids, most likely

due to their being clogged with cerumen, commonly referred to as earwax.  Once the aids were

cleaned, the Plaintiff reported being able to hear very well with his hearing aids.  (Id. at 187.)

Treatment notes from March 4, 2002 report that the Plaintiff's hearing aids were checked.  At

this time, the Plaintiff reported that he had been wearing his hearing aids consistently, and he

found that he heard better when using them.  (Id. at 191.)

ii.     *Consultative Examinations and State Agency Review*

In addition to treatment at the VA, the Plaintiff underwent two physical consultative examinations.  The first of these examinations was performed by Wei Kao, M.D., a doctor not employed by the VA, on May 31, 2001.  (Id. at 120-127.)  During this examination, the Plaintiff reported hearing loss, headaches, joint pains, and peptic ulcer disease.  He denied having "difficulty walking."  (Id. at 120.)  According to Dr . Kao's "final assessment," the Plaintiff's hypertension was "in good control" and Dr. Kao made "no significant findings" with regards to the headaches of which Starks complained.  (Id. at 123.)  Dr. Kao also reported that the Plaintiff had a hearing problem, specifically nerve deafness, but was able to hear equally.  The Plaintiff suffered mild DJD [degenerative joint disorder]; and the Plaintiff had peptic ulcer disease that was stable and caused no intestinal bleeding.  Dr. Kao recorded that Starks suffered from depression and referred him to a psychiatrist.  Overall, Dr. Kao found that the Plaintiff's capacity was "[l]imited."  (Id.)  According to Dr. Kao, the Plaintiff's prognosis was "[f]air," and "[o]ther th[a]n decreased hearing [the Plaintiff] has full capacity."  (Id. at 124.)

The Plaintiff underwent a consultative examination for hearing loss by Maurice Cohen, M.D. on June 28, 2001.  (Id. at 128-32.)  Dr. Cohen noted that the Plaintiff was able to converse intelligibly at conversational levels.  (Id. at 129.)  As reported, the Plaintiff had bilateral "moderately severe to borderline normal" hearing loss, or 35.625 hearing loss in the right ear and 30 percent hearing loss in the left ear.  (Id. at 129, 130.)  Dr. Cohen recommended the Plaintiff as a candidate for hearing aids to improve his function with daily living and work environment.  In addition, he recommended further testing of the auditory canals and fiber optic evaluation of the

nasopharynx and larynx.  (Id. at 128-32.)

A Physical Residual Functional Capacity Assessment dated July 18, 2001 was prepared by state agency personnel based on an examination of the record.  According to the state's findings, the Plaintiff has no exertional, postural, manipulative, visual, or environmental limitations.  (Id. at 135, 137, 138, 139, 141.)  The report indicates that the Plaintiff has some communicative limitations.  Further, it describes the Plaintiff's hearing and speaking as "unlimited" and notes that the Plaintiff was a candidate for a hearing aid.  (Id. at 140.)  In conclusion, the report states that "[i]n spite of impairments, clmt is able to return to past relevant work."  (Id. at 144.)

### 3. *Depression and Anxiety*

#### i. *Treating Physician Examinations*

The record indicates that the Plaintiff was diagnosed with depression and anxiety by treating physicians at the VA, including Dr. Phui-Hung Tam, Dr. Marie Weinberger, and Dr. Ahmed.  (Id. at 65.)  The Plaintiff also identified Dr. Cindy Mennel at the VA as someone he had visited for depression and anxiety.  (Id. at 66.)  In addition, Antonio Garcia, M.D. treated the Plaintiff from July 1976 to December 1997 for conditions including hypertension, depression, mental stress and fatigue, fear in an enclosed environment, and reversal of sleep patterns.  (Id. at 88, 89, 213, 214.)  Dr. Garcia's diagnoses pre-date the Plaintiff's alleged date of disability onset.

According to psychiatric treatment notes dated January 29, 1998, the Plaintiff requested an psychiatric evaluation for depression.  He received a psychiatry referral and was diagnosed with "occupational problems."  (Id. at 109-110.)  According to the consultation report, Starks indicated that he did not feel that he needed further treatment at that time.  (Id.)

In April 1998, the Plaintiff was again referred for psychiatric treatment. At this time, he was referred to Dr. Weinberger, a staff psychiatrist at the VA Center. According to Dr. Weinberger's treatment notes dated October 28, 1998, she prescribed Prozac, an antidepressant, to Starks. The Plaintiff discontinued taking the medication after one week because he felt "too tired" from the medication. (Id. at 106.) Dr. Weinberger's notes indicate that the Plaintiff reported that he was feeling better and feeling less despondent. She characterized Starks' report as "very vague." (Id.) Dr. Weinberger also reported that Starks had requested a letter stating that he needed a different work environment because he could not function well in his current work environment. Responding to that request, in a letter dated October 29, 1998, Dr. Weinberger reported that the Plaintiff had been treated at the VA Center for symptoms of depression and anxiety. She noted the deleterious effect that stress had on the Plaintiff's functional limitations. In addition, Dr. Weinberger advised that if Starks were to work in a less stressful environment, he might experience improved concentration and reduced tension. (Id. at 117.)

The Plaintiff returned to the VA in September 26, 2001 with complaints of a watery right eye and stuffiness in his nose. (Id. 166-70, 172-73.) At this time, he was diagnosed with depression, and he was once again referred to psychiatry. (Id. at 166.)

Treatment notes from the Plaintiff's visit to the VA on March 4, 2002 report that Starks was unemployed and was exhibiting stress about his lack of employment. (Id. at 188.) He had missed a psychiatry appointment and told his physician that he wanted to wait to begin treatment until he was more financially settled. (Id. at 189.) He was scheduled to meet with a social worker and the VA finance office at this time. (Id. at 188.)

    *ii.*       *Consultative Examinations and State Agency Review*

In May 2001, the Plaintiff underwent a psychiatric consultive examination by Alexandra Sporn, M.D., who completed a written psychiatric evaluation based on an interview with the Plaintiff. Dr. Sporn reported that Starks' thought process was logical, coherent, and comprehensible. (Id. at 118.) His concentration, orientation, short term and long term memory were good. His abilities to sustain concentration and persistency as well as his social adaptability were good. (Id. at 118-119.) Dr. Sporn found that Starks suffered from anxiety and that the Plaintiff would be well suited for employment consisting of manual labor, such as working on a loading dock. Dr. Sporn elaborated: "It is unclear why he could not work at a job which would take his anxiety into some sort of understanding. He may not be able to do serious counseling but working on a loading dock or manual labor should be something he could handle." (Id. at 119.) Dr. Sporn also reported that the Plaintiff had a Global Assessment of Functioning ("GAF") of 50, which indicates a serious impairment to social, occupational or school functioning. (Id.)[2]

Psychiatrist Joshua Algaze, M.D. examined the Plaintiff on March 31, 2003. (Id. at 215-218.) The Social Security Administration sent the Plaintiff for a consultive examination by Dr. Algaze at the request of his attorney because Dr. Sporn had not made any psychiatric diagnosis based on her consultative examination. (Id. 248, 254.) Dr. Algaze diagnosed the Plaintiff's

---

[2]GAF is a tool used to assess a claimant's functioning level on several "axes," which each refer to a different class of information. Axis I referes to clinical disorders, Axis II refers to developmental and personality disorders, Axis III refers to general medical conditions, Axis IV refers to psychosocial and environmental problems, and Axis V cites the patient's global assessment of functioning. Am. Psych. Ass'n Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 25 (4th Ed. 1994). A GAF score between 41 and 50 indicates serious symptoms or a serious impairment to social, occupational, or school functioning (e.g., no friends, inability to keep a job). A GAF score between 51 and 60 reflects moderate symptoms or moderate difficulties in social, occupational, or school functioning. DSM-IV at 32.

mood as "slightly euthymic," that is statistically or otherwise normal. (Id. at 216.) Applying the

DSM-IV multiaxial assessment, Dr. Algaze reported agoraphobia with panic attacks and a need

to rule out alcohol abuse on Axis I (clinical disorders); he reported a personality disorder NOS

(not otherwise specified) on Axis II (developmental and personality disorders); and deferred

making any diagnosis on Axis III (general medical conditions). (Id.) Dr. Algaze reported that

the Plaintiff would have moderate problems with the following: carrying out detailed

instructions; making simple work related judgments; interacting appropriately with supervisors

and co-workers; responding appropriately to work pressures; and responding appropriately to

changes in work routine and setting. (Id. at 215-218.) According to the form provided to and

completed by Dr. Algaze, a moderate limitation is one that allows the individual evaluated to

function satisfactorily. (Id. at 217.)

### D. Non-Medical Evidence

#### 1. Plaintiff's Testimony

The record includes the Plaintiff's Disability Report and his testimony before the ALJ. In

his Disability Report, the Plaintiff stated that he was unable to work due to difficulty

concentrating and remembering, irritability, difficulty completing tasks, difficulty hearing

directions and instructions, and difficulty sleeping. (Id. at 62) The Plaintiff reported that, in

general, he functions "normally," although he was less sociable, less able to concentrate, and less

interested in most things than the standard for normality. (Id. at 76.) He indicated that he is able

to complete household chores, to cook for himself, to get around by walking or using public

transportation, and to handle his own money. (Id. at 77-79.) In addition, the Plaintiff reported

that his hobbies and interests include watching television, playing chess, and working on the computer.  (Id. at 79.)   At the hearing, the Plaintiff communicated his ability to do his own laundry as well as to sweep and to mop.  (Id. at 248.)  With regard to his hypertension, the Plaintiff explained that he was not taking any medication because he believed that the medications that he was prescribed had not significantly helped him and had the effect of making him drowsy.  (Id. at 246.)  In response to a question from the ALJ regarding Starks ability to function without the anti-hypertension medicines, the Plaintiff explained: "Well, I'm functioning, you know.  I mean not in stressful situations."  (Id. at 245.)  The Plaintiff further explained that his hearing, concentration, and memory were adversely affected by stressful situations.  (Id.)  The Plaintiff also indicated that he had difficulty standing in one position for more than 15 minutes as well as walking for more than 20 minutes.  (Id. at 247.)

### 2.    *Vocational Expert Testimony*

Vocational expert Pat Green testified at the hearing.  Green had no social or professional contacts with the Plaintiff and knew him only through the case record.  (Id. at 249-250.)   She identified the Plaintiff's vocational status as follows: "Caseworker child welfare.  The DOT [Dictionary of Occupation Titles] code is 195.107-014, SVP 7, skilled work at a light level."  (Id. at 250.)  She testified that an inability to hear people who speak in a low voice would not preclude an individual from doing that category of work.  (Id. at 251.)  Upon examination by the Plaintiff's attorney, she testified that being a case manager qualified as a stressful job.  (Id. at 253.)  Further, she indicated that an individual such as the Plaintiff, who suffered from an inability to concentrate triggered by stressful situations, would be unable to perform the job of a

child welfare caseworker.  (Id. at 254.)

## II.    Discussion

### A.    Standard of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error.  42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  A reviewing court should verify that a claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act."  Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)).

A full hearing includes a well-developed medical record.  Because of the non-adversarial nature of a benefits hearing, where the record is incomplete, an ALJ has an affirmative duty "to develop a claimant's medical history even when the claimant is represented by counsel . . . ." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)).  The "treating physician rule" requires an ALJ to afford greater weight to the medical opinion of the claimant's treating physician than to other evidence before the Social Security Administration.  The treating physician's rule as articulated by the Second Circuit provides: "the opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence."  Rosa, 168 F.3d at 78-79; 20 C.F.R. § 404.1527(d)(2).  Further, in evaluating medical evidence, an ALJ must give good reasons for the weight the ALJ assigns to the opinions of a claimant's treating source.  20 C.F.R. § 404.1527(d)(2); see Rosa, 168 F.3d at 79 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir.

1998)).

*B.    The ALJ's Decision*

To receive benefits, a claimant must be "disabled" within the meaning of the Social Security Act. <u>Shaw</u>, 221 F.3d at 131. Agency rules require the Commissioner to apply a five-step sequential analysis to evaluate whether a claimant is disabled. <u>See</u> 20 C.F.R. § 404.1520.

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

<u>Shaw</u>, 221 F.3d at 132 (citing <u>DeChirico v. Callahan</u>, 134 F.3d 1177, 1179-80 (2d Cir. 1998)).

The ALJ acknowledged this analytical framework in his decision regarding the Plaintiff's eligibility for disability benefits. (Tr. 19-20.) He found that the Plaintiff met the disability requirements of the first two steps, because Starks was not engaged in gainful activity and because his impairments, including hypertension, hearing loss, depression, and anxiety, were "severe" within the meaning of 20 C.F.R. § 404.1520(b). In addition, the ALJ found that the

Plaintiff was fully insured for Title II purposes.  (Tr. 12.)  In the third step, the ALJ found that, although the Plaintiff's impairments were "severe," they did not meet or equal any impairment listed in Appendix 1 of the regulations.  (Id. at 19.)  The ALJ found that the Plaintiff did not meet the disability requirement of step four because Starks had a residual functional capacity sufficient to return to his previous work as a case technician, a job that generally required a sedentary level of exertion and, as performed by the Plaintiff, could be categorized as light work.  (Id. at 20.)

As a preliminary matter, the ALJ noted that the record established that the Plaintiff suffered chronically elevated blood pressure, hearing loss, and "to a lesser degree, depression and anxiety," which have caused significant vocationally relevant limitations.  (Id. at 13.)  Having attributed the Plaintiff's chronic high blood pressure to "equally chronic non-compliance in taking his medications and adhering to his prescribed diet," the ALJ concluded that the Plaintiff's elevated blood pressure did "not play much of a role in considering [claimant's] residual functional capacity."  (Id. at 13.)

In sum, the ALJ found that the Plaintiff had no exertional or non-exertional limitations.  (Id. at 16, 17.)  The ALJ based his determination that the Plaintiff had no exertional limitations on the facts contained in treating records from the VA that, according to the ALJ, reported that to the extent that they existed, the Plaintiff's physical symptoms mostly related to high blood pressure.  According to the ALJ, the medical conclusion in the VA records that the Plaintiff was "asymptomatic" was a "description consistent with an unlimited capacity."  (Id. at 16.)  According to the ALJ, this conclusion was also supported by the medical reports of state agency physician Dr. Kao and non-examining physician Dr. Santos.  (Id.)  The ALJ also indicated that he accorded no weight to the Physical Residual Functional Capacity Assessment dated July 18,

2001, because it was not prepared by a physician or other medical expert.  (Id.)

The ALJ based his determination that the Plaintiff had no non-exertional limitations on what he characterized as a lack of clinical signs or diagnoses, lack of treatment, and the opinion of examining physician Dr. Sporn.  (Id. at 17.)  In reaching the conclusion that the Plaintiff had no non-exertional limitations, the ALJ discounted the opinion of Dr. Weinberger contained in the letter dated October 29, 1998, which stated that stress adversely affected the Plaintiff's functional limitations and that were he to work in a less stressful environment, he might experience improved concentration and reduced tension.  (Id.)  The ALJ found that the statements included in Dr. Weinberger's letter lacked medical bases and seemed to "regurgitate" the substance of the Plaintiff's request.  (Id.)

The ALJ's overall determination was also based on his conclusion that the Plaintiff's complaints were not credible.  Specifically, the ALJ found that the Plaintiff's complaints were contradicted by his own testimony, including his admission that, with minor exceptions, he generally functions normally.  (Id. at 18.)  In addition, the ALJ reasoned that the Plaintiff's claims that he had difficulty concentrating or sitting for prolonged periods of time were contradicted by his testimony that he enjoyed playing chess and working on the computer.  (Id.)  Moreover, according to the ALJ, Starks' statements that he had difficulty standing and walking were undermined by his testimony that he was able to mop and sweep.  (Id.)

C.     The Plaintiff's Claims

1.     The ALJ's Failure to Comply with Regulation Regarding Failure to Follow Prescribed Treatment

The Plaintiff asserts that the ALJ improperly applied 20 C.F.R. § 404.1530 regarding the plaintiff's failure to follow prescribed treatment for hypertension. That regulation provides that in order to get benefits, a claimant must follow treatment prescribed by his or her physician if such treatment can restore his or her ability to work. 20 C.F.R. § 404.1530(a). When a claimant does not follow the prescribed treatment without good reason, the claimant will not be found "disabled" and will not receive benefits. 20 C.F.R. § 404.1530(b). An ALJ must consider a claimant's physical, mental, educational, and linguistic limitations when determining if a claimant has an acceptable reason for failing to follow prescribed treatment. 20 C.F.R. § 404.1530(c).

Specifically, the Plaintiff contends that the ALJ erred by substituting his own judgment for acceptable medical reasons for Starks' failure to take anti-hypertensive medications. The Plaintiff argues that the prescribed medications made him tired and caused dizziness and headaches, and, thus he was justified in refusing to take anti-hypertension medications. The ALJ expressed that the Plaintiff's refusal to follow prescribed treatment for hypertension compelled him to conclude that Stark's high blood pressure "had little deleterious impact on his ability to function." (Tr. 13.) However, this court notes that the ALJ did not make a specific finding regarding Starks' failure to take prescribed medications. In SSR 82-59, the Commissioner permits a finding on the issue of a claimant's failure to follow prescribed medical treatment only if all four of the listed conditions in the ruling are met. One of the conditions is that "the evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity. . ." SSR 82-59. Because the ALJ determined that the Plaintiff had no exertional limitations that would impair his ability to return to his prior employment, the ALJ could not

have made a finding that his refusal to take medication was a failure to follow treatment.  Agudo-Martinez v. Barnhart, 413 F. Supp. 2d 199, 213 (W.D.N.Y. 2006) (finding that an ALJ could not have made a finding that refusal to take medical was a failure to follow treatment because the ALJ determined that plaintiff's mental limitations did not impair his ability to engage in substantial gainful activity) (citing Roberts v. Shalala, 66 F.3d 179, 183 (9th Cir. 1995); Lozada v. Barnhart, 331 F. Supp. 2d 325, 340 (E.D. Pa. 2004)).

2. *The ALJ Improperly Discounted a Treating Physician's Assessment of Non-Exertional Limitations*

The Plaintiff asserts that the ALJ improperly discounted treating physician Dr. Weinberger's opinions expressed in a letter dated October  29, 1998.  In that letter Dr. Weinberger noted the deleterious effect that stress had on the Plaintiff's functional limitations. In addition, Dr. Weinberger advised that if Starks were to work in a less stressful environment, he might experience improved concentration and reduced tension.  (Tr. 117.)  Specifically, the Plaintiff argues that the ALJ "did not offer a reasonable basis to support his finding that the conclusions reached by the treating psychiatrist were no more than a 'regurgitation' of the claimant's complaints, and thus, impliedly, to be disregarded."  (Mem. of L. in Opp. Comm'r's Mot. J. Pleadings at 11.)

Consistent with the regulations, courts in the Second Circuit give the opinion of a treating physician "controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence."  Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999) (citing 20 C.F.R. §§ 404.1527(d)(2)).  The "combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not

merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability." Santos v. Barnhart, No. 04-CV-2050, 2005 WL 119359, at *6 (E.D.N.Y. Jan. 7, 2005) (quoting Brown v. Barnhart, No. 02-CV-4523, 2003 WL 1888727, at *8 (S.D.N.Y. Apr. 15, 2003)). If an ALJ suspects an insubstantial psychiatric basis for a physician's medical conclusions, or that the physician had not in fact written or provided the information reported, the ALJ would have an obligation to re-contact the treatment source for clarification. 20 C.F.R. §§404.1519p(a), 416.919p(a).

In the instant case, the ALJ failed to contact Dr. Weinberger to obtain specific diagnoses that would enable the ALJ to evaluate the weight that should be given to her letter as well as to evaluate the Plaintiff's condition more fully. Where the ALJ suspected an insufficient psychiatric basis for the opinions contained in Dr. Weinberger's letter, he had an obligation to re-contact Dr. Weinberger for clarification. See 20 C.F.R. §§404.1519p(a), 416.919p(a).

Moreover, the record as a whole contains only informal treatment notes from the Plaintiff's treating physicians at the VA. Relating to the Plaintiff's depression and anxiety, records obtained from Dr. Phui-Hun Tam, Dr. Ahmed, and Dr. Weinberger fail to provide opinions as to the nature and the severity of the Plaintiff's impairments. Due to the frequency and duration of their visits with Starks, physicians at the VA may have a "unique perspective" and an important "longitudinal picture" for evaluating Stark's condition. See 20 C.F.R.§ 404.1527(d)(2). Only consultative physicians Dr. Sporn and Dr. Algaze made specific diagnoses regarding the severity of the Plaintiff's non-exertional impairments. Given that the ALJ specifically cited what he characterized as a lack of clinical signs or diagnoses as a basis for his

finding that the Plaintiff had no non-exertional limitations, the failure to obtain more detailed

medical findings from Starks' treating physicians is problematic. (See Tr.17.)

When an ALJ fails to adequately complete the record, the reviewing court may remand

for administrative proceedings to further develop the record. Green v. Apfel, 25 Fed. Appx. 54,

56 (2d Cir. 2001). On remand, the ALJ should develop the record as prescribed by 20 C.F.R. §

1512(d), (e). Specifically, he should attempt to obtain more detailed evaluations from Dr.

Weinberger and other treating physicians at the VA.

3.     The ALJ's Failure to Make Specific Findings Regarding Vocational
       Capacity

The Plaintiff claims that the ALJ failed to make specific findings regarding Starks'

vocational capacity. Related to this claim, the Plaintiff contends that in completing the fourth

step of analysis, the ALJ failed to evaluate a report of consultive examining physician Dr. Sporn

that reported that the Plaintiff had a GAF score of 50, indicating a serious impairment to social,

occupational or school functioning.

In the fourth step of analysis, an ALJ must determine whether the job duties of the

claimant's prior work have an exertional requirement of "sedentary," "light," "medium," or

"heavy" work. See 20 C.F.R. § 404 Subpt. P, App. 1. The Step Four finding is guided by the

Social Security Administration's assessment of the Plaintiff's Residual Function Capacity

("RFC"), which is an administrative determination of whether a claimant can engage in

sedentary, light, medium, or heavy work. Although an RFC is issued by the Social Security

Administration, the ALJ must assess the RFC based on all relevant evidence, and a treating

physician's opinion or medical assessment can contradict an RFC. Sobolewski v. Apfel, 985 F.

Supp. 300, 309 (E.D.N.Y. 1997).

The ALJ must determine, based on the RFC, the medical evidence, and the testimony of a vocational counselor regarding the exertional requirements of claimant's past positions, whether he can return to a former position. The ALJ must consider whether the limitations imposed by claimant's condition(s) render him unable to perform one or more of the activities required by a position, i.e. the ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, and crouch. 20 C.F.R. § 404.1545(b). For example, to determine whether the claimant is capable of performing sedentary work, ALJ must find that the claimant can (1) lift up to 10 pounds; (2) "occasionally lift[] or carry[]," and (3) engage in "a certain amount of walking and standing . . ." 20 C.F.R. § 416.967. To be found capable of these activities, the ALJ must find that claimant can perform these functions on a sustained basis throughout the work day. <u>Johnson v. Apfel</u>, 97-CV-3442, 1998 U.S. Dist. LEXIS 9939, at *18-19 (E.D.N.Y. 1998). A finding that claimant is capable of sedentary work therefore requires the ALJ to determine that claimant can perform "up to two hours of standing or walking and six hours of sitting in an eight-hour work day." <u>Curry v. Apfel</u>, 209 F.3d 117, 123 (2d Cir. 2000).

In the present case, the ALJ erred in concluding that the Plaintiff did not meet the disability requirement of step four because he failed to make specific findings regarding Starks' vocational capacity. (<u>Id.</u> at 20.) The ALJ's conclusory remark that the medical conclusion that the Plaintiff was "asymptomatic" was a "description consistent with an unlimited capacity" (<u>id.</u> at 16) exhibits failure to heed the formal requirements imposed by 20 C.F.R. § 404.1545(b). The regulations require specific consideration of a claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, and crouch. Moreover, the medical record is thin, and the ALJ

failed to respond to evidence that potentially conflicts with his conclusion, including Dr. Sporn's report that the Plaintiff had a GAF score of 50, indicating a serious impairment to social, occupational or school functioning. "In the absence of a medical opinion to support the ALJ's finding as to [plaintiff's ability to perform the full range of light work], it is well-settled that 'the ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion.'" Johnson, 1998 U.S. Dist. LEXIS 9939, at *16-17 (quoting Balsamo v. Chater, 142 F.3d 75, _ (2d Cir. 1998) (citing McBrayer v. Secretary of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983))).

On remand, the ALJ should make specific findings regarding Starks' vocational capacity as prescribed by 20 C.F.R. § 404.1545(b). In addition, he should address how Dr. Sporn's GAF evaluation weighs in his decision.

### D.    Remand or Award of Benefits

"When the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," reversal of the ALJ decision and remand for the calculation of benefits is appropriate. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). However, "when there are gaps in the administrative record or the ALJ has applied an improper legal standard," a court should remand the case to the Commissioner for the further development of the record. Id. As there are areas that the ALJ failed to consider in reaching his decision, remand is appropriate in this case. On remand, the ALJ should develop the record as prescribed by 20 C.F.R. § 1512(d), (e). Specifically, he should attempt to obtain more detailed evaluations from Dr. Weinberger and other treating physicians at the VA. In addition, the ALJ should make

specific findings regarding Starks' vocational capacity as prescribed by 20 C.F.R. § 404.1545(b), and he should address how Dr. Sporn's GAF evaluation weighs in his decision.

**III. Conclusion**

For the foregoing reasons, the Commissioner and the Plaintiff's motions for judgment on the pleadings are DENIED. The case is REMANDED to the Social Security Administration for further proceedings consistent with this opinion.

SO ORDERED.

Date:   August 16, 2006                          _____/s/_____
        Brooklyn, New York                       Nicholas G. Garaufis
                                                 United States District Judge